UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                              )
ERIKA D. LUCEUS,              )
                              )
          Plaintiff,          )
                              )
     v.                       )     C.A. No. 15-489 WES
                              )
                              )
STATE OF RHODE ISLAND and RHODE )
ISLAND DEPARTMENT OF LABOR AND  )
TRAINING,                     )
                              )
          Defendants.         )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

    The Defendants State of Rhode Island and Rhode Island
Department of Labor and Training ("DLT" or "Department") ask the
Court to grant them summary judgment (ECF No. 50) on the claims
outstanding in Plaintiff Erika D. Luceus's Second Amended
Complaint ("SAC") (ECF No. 24).[1] The Court does so for the reasons
that follow.

---

[1] These are a Title VII disparate impact claim (Count I); a
Title VII disparate treatment claim (Count II); and a retaliation
claim under the Civil Rights Act of 1866 (Count IV). See Luceus v.
State of Rhode Island, C.A. No. 15-489ML, 2016 WL 7971311, at *6
(D.R.I. Dec. 13, 2016), adopted by CA NO. 15-489 ML, 2017 WL
318646, at *1 (Jan. 23, 2017).

I.    Background[2]

Luceus is an employee at DLT, and a black woman. (SAC 3.)
After taking a bachelor's degree in political science and master's
degrees in public administration and in library and information
science, she was hired in February 2009 as a Senior Employment and
Training Interviewer ("SETI") in DLT's Call Center. (Id.) She was
still employed in this capacity at the time she filed her
complaint. (Id.) As a SETI, Luceus provided customer service to
Rhode Island residents seeking unemployment benefits. (Id.)

As in many workplaces, a hierarchy exists among positions in
DLT's Call Center. (Defs.' Statement of Undisputed Facts in Supp.
of Their Mot. for Summ. J. ("DSUF") 1-2, ECF No. 50-1.) DLT has
what it refers to as management positions and union positions.
(Id.) All of the management positions are located ahead of all of
the union positions in the organizational pecking order. (Pl.'s
Obj. to Defs.' Mot. for Summ. J. ("Pl.'s Obj."), Ex. 10, 1, ECF
No. 53-10.) But not all management positions, nor all union
positions, are of equal prominence. (See id.) Each management
position is located somewhere within the hierarchy of management
positions, and likewise for union positions. (See id.) For example,
the position of Director is the preeminent management position,

---

[2] As it must, this section presents the undisputed facts in
the light most favorable to Luceus. See, e.g., Terry v. Bayer
Corp., 145 F.3d 28, 30 (1st Cir. 1998).

whereas Employment and Training Manager is the lowliest. (Id.) On the union side, Benefit Accuracy Monitor is the highest-ranking position, and Support Staff is at the bottom. (Id.)

SETI, Luceus's position, is second from the bottom on the union side, that is, the second least senior position in all of DLT, ahead of only Support Staff. (Id.) In her time at DLT, Luceus has seen numerous employees with less education and experience than she promoted to positions above SETI in the Call Center. (SAC 3.) Several of these promotions came after Call Center management had appointed a DLT employee to serve in a temporary capacity in an open position until the formal hiring process produced a permanent hire. (Id. at 3-4; Pl.'s Statement of Undisputed Facts in Supp. of Her Obj. to Defs.' Mot. for Summ. J. ("PSUF") 15, ECF No. 65.)

These temporary appointments are known within the Department as three-day-rule assignments, after a provision in the relevant collective-bargaining agreement that requires DLT pay a temporarily assigned union employee the amount associated with her temporarily assigned position, if the union employee remains in that position for at least three days. (DSUF 4-5.) While a three-day-rule assignment is not permanent, there is no limit to the time an employee may remain temporarily assigned. (Defs.' Reply Mem. in Supp. of Their Mot. for Summ. J. ("Defs.' Reply"), Ex. 6, 21-22, ECF No. 61-6.) Furthermore, DLT does not conduct a formal

application process before making a three-day-rule assignment. (SAC 5.) Rather, Call Center brass exercises its discretion to appoint someone whom it feels has the requisite experience and ability to assume the duties of the open position. (DSUF 8-9.)

DLT managers made at least a dozen three-day-rule assignments to positions in the Call Center from August 23, 2010, to November 4, 2015. (See PSUF 5-15; Defs.' Reply, Ex. 7, 1-2, ECF No. 61-7.) And at least five of these assignees were able to parlay their temporary appointments into permanent promotions, either to the position to which they were temporarily assigned or to another management position. (See PSUF 5-15; Pl.'s Obj., Ex. 4, 1, 4-8, 11-14, 19-22, 24-25, ECF No. 64-4; Defs.' Reply, Ex. 7, 1-2.) For example, DLT appointed Dyana DiChiro-Bogan acting Employment and Training Manager (the most junior of the management positions) in August 2010 and acting Senior Employment and Training Manager in November 2010. (Pl.'s Obj., Ex. 4, 1, 4.) DiChiro-Bogan was subsequently promoted to permanent Principal Employment and Training Manager in September 2011. (Id. at 7.) Similarly, Jeanne Pezzullo, Janean Frederic, and Garrett Tiernan were all temporarily assigned at one point to acting Employment and Training Manager before becoming permanently hired for that position. (Id. at 13, 20, 22, 24-25.) Jessica Videira became acting Principal Employment and Training Officer in November 2010 (id. at 4), and while the record does not indicate whether she was ever hired

permanently for that position, it does show that Videira had been hired permanently to a more-senior position, Chief of Labor and Training Operations, by November 2013 (see id. at 15).

DLT also afforded select employees new opportunities to gain experience through a noncompetitive transfer process. (See, e.g., PSUF 8.) Unlike three-day-rule assignments, these transfers did not result in movement up the hierarchy, and therefore were not accompanied by increased remuneration. (DSUF 13-15; Defs.' Reply, Ex. 7, 1-2.) Nonetheless, these lateral moves presented employees occasion to learn new skills, making them more competitive for future promotional opportunities with attendant raises. (Pl.'s Obj. 38.)

For example, DLT selected a number of employees to be part of the Consortium Project, whose goal was to modernize the State's unemployment insurance system, including aspects of the Call Center. (DSUF 15.) Appointment to the Consortium Project was highly sought after by DLT employees, notwithstanding the fact that it did not entail an increase in pay or movement up the formal hierarchy. (DSUF 16; Pl.'s Obj., Ex. 6, Cedroni Aff., 4 (ECF No. 64-6) ("I was selected to work in the Consortium. This was a coveted assignment.")) At least one Call Center Employee, Beth Gordon, secured a permanent promotion after working on the Consortium Project. (Defs.' Reply, Ex. 7, 1-2.)

Luceus has received neither a promotion nor a sought-after lateral transfer at DLT, despite her more than seven years of experience at the Department and her bachelor's and master's degrees. (SAC 3.) According to Edward Salabert, an employee who had worked at DLT for 36 years, Luceus's resume indicated that she was "qualified to be a manager," and that "[h]er education experience surely merits her being seriously considered for a management position." (Pl.'s Obj., Ex. 6, Edward Salabert Aff., 11-12.) Luceus admittedly lacked managerial experience at DLT, but so did employees like DiChiro-Bogan, Alyssa Alvardo, and Jason Bliss-Wohlers, who nevertheless secured management positions. (Pl.'s Obj. 17-20.)

Even though Luceus merited serious consideration for advancement, she was not always up for employee-of-the-month. As Luceus became disenchanted by what she felt was a rigged promotional system, she grew alienated from and frustrated with some of her co-workers. (DSUF 21-39.) In 2011, for example, Luceus became involved in a boisterous argument with a colleague, an argument that required a third-party to physically separate the combatants. (Id. at 22.) She also refused work assignments and quit on assignments she had accepted. (Id. at 24-26.)

In 2015, Luceus protested the promotional system by posting provocative signs in her cubicle. One such sign read "Screw Up and Move Up," in reference to Luceus's conviction that less-than-

qualified DLT employees regularly received promotions. (DSUF 23.)
Rose Lemoine, a senior manager at DLT, testified that this behavior
was the reason Luceus failed to secure a promotion. (Lemoine Dep.
156, ECF No. 50-14 (Luceus "wasn't considered [for a management
position] after a certain period of time because of her behavior
and her attitude towards the department and her actions as an
employee of the Call Center.").)

At times disruptive, Luceus's discontent was far from
idiosyncratic. Various DLT employees complained of and even
resigned over what they considered a racist, nepotistic
promotional system. Monique Perkins, a black former DLT employee,
voluntarily resigned after four-and-a-half years "because [she]
observed that promotions continued to be given primarily to white
individuals who had been selected for acting positions, and based
on factors not related to merit," and because she did not "believe
there was equal opportunity for individuals of color to be
promoted." (Pl.'s Obj., Ex. 6, Perkins Aff., 1-2.)

Other former employees – including Steven Cedroni, Doryane
Carter, Sareth Chea, Victoria Alves Salabert, and Margarita Antuna
– all echoed Perkins's sentiment that DLT's promotional practices
denied black employees an equal opportunity to advance in the
Department. (See, e.g., id., Antuna Aff., 13-14 ("DLT has a pattern
of creating acting/temporary positions and filling them with white
family and friends of upper management); id., Victoria Alves

Salabert Aff., 9-10 ("I have been employed by the [DLT] since 2001. . . . I am still in the same entry-level position I was in when I started. . . . I had to train acting managers hired after me.").) Cedroni, a white man and ex-employee at DLT who voluntarily resigned in 2014, described DLT as "a political cesspool," where "nepotism is rampant" and where "acting and temporary positions [were] created and filled with Caucasians who were selected by management." (Id., Cedroni Aff., 4-5.)

This feeling, not uncommon, that the Department's promotional system was fixed led to a climate of mutual suspicion between minority and white DLT employees. (See id., Chea Aff., 7 ("On numerous occasions, when I or an employee of color entered a room in the workplace in which managers were conversing, I observed the managers immediately cease speaking.").) Worse, employees who complained about the promotional system, including Luceus, were punished for doing so. For example, DLT management excessively surveilled and scrutinized Luceus, and even dissuaded co-workers from interacting with her, after she complained about the Department's promotional practices. (Pl.'s Obj. 59-62.) DLT management treated Perkins similarly: "It was [her] experience at DLT that managers were vindictive and retaliatory, and that they applied heighted scrutiny towards minority employees . . . who complained about unfair promotional practices." (Pl.'s Obj., Ex. 6, Perkins Aff., 1-2.) Some even claimed DLT management sabotaged

their attempts to find other employment. (See id. Antuna Aff., 14 ("DLT retaliated against me for complaining about racial discrimination and lack of equal employment opportunities by not verifying my date[] of employment at DLT with other perspective employers.").)

Slights to complaining employees occurred indirectly too: after Luceus and Chea filed internal complaints about DLT's hiring practices, management responded by promoting three different minority employees to acting assignments. (See id., Chea Aff., 8.) As Chea testified: "I believe that Jean Barnes, Janean Frederic[] and Sandra Bec[]ton-Miller were promoted to acting managers as a direct consequence of the complaints filed by myself and Erika Luceus . . . ." (See id.) These promotions leapfrogged Barnes, Frederic, and Becton-Miller over more-senior minority employees who had expressed misgivings about DLT's promotional practices. (See id., Victoria Alves Salabert Aff., 9 ("Despite the fact that I had more seniority than . . . Jean Barnes and Janean Frederic . . . Rose Lemoine did not promote me out of retaliation for my being vocal about the lack of equal opportunity for minorities.").)

The Department's hiring and promotions created the following statistical picture in the Call Center. As of late 2013, the Call Center had seventy-one white and thirty-nine minority employees. (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Ex. J, 1, ECF 50-11.) But even though white and minority employees made up sixty-five

and thirty-five percent of Call Center employees, respectively, ninety percent of Call Center management positions were occupied by white employees. (See id.) And at that time, ninety-three percent of those working on the Consortium Project were white. (Id.) As of 2016, the Call Center still had seventy-one white employees, but the number of minority employees had dropped to thirty-two. (Defs.' Mot., Ex. K, 1, ECF. 50-12.) At that point, after Barnes, Frederic, and Becton-Miller were promoted to management positions, sixty-nine percent of all Call Center employees were white, but white employees made up eighty-three percent of management and ninety-three percent of those working on the Consortium Project. (See id.)

II. Discussion

On October 22, 2014, Luceus filed a discrimination charge with the Rhode Island Commission for Human Rights. (DSUF 10.) The Commission found, on June 29, 2015, that Luceus had not substantiated her allegations of discrimination. (Id.) Luceus commenced this action on November 17, 2015. She twice amended her complaint, resulting in the filing of the now-operative SAC on August 9, 2016. Defendants now move for summary judgment.[3]

---

[3] The defendants have previously moved for judgment on the pleadings. And in a report and recommendation dated December 13, 2016, Magistrate Judge Lincoln Almond advised the Court to grant in part Defendants' motion. See Luceus, C.A. No. 15-489ML, 2016 WL 7971311, at *6. Magistrate Almond found, inter alia, that Luceus had "exhausted her administrative remedies as to the

10

A.    Legal Standard

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assess the proof in order to determine the need for a trial." Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 16-17 (1st Cir. 2004). In conducting its summary judgment calculus, the Court must "scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). Where, as here, the nonmovant has the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant fulfills this duty, the burden shifts to the nonmovant to "produce specific facts, in suitable evidentiary form, to establish the

_____

discrimination theories pled in her Second Amended Complaint." Id. at *4. He also found that the Eleventh Amendment required dismissal of Luceus's claims against the State under Rhode Island's Fair Employment Practices Act and Rhode Island's Civil Rights Act. Id. at *5. On January 23, 2017, Judge Mary M. Lisi accepted Magistrate Almond's Report and Recommendation in its entirety, leaving the three live claims in Luceus's SAC discussed here. Luceus, 2017 WL 318646, at *1. Upon Judge Lisi's retirement, the case was assigned to Judge John J. McConnell, Jr., who held a hearing on Defendants' summary judgment motion on October 2, 2017. Subsequently, on October 10, 2017, Judge McConnell recused himself, and the case was reassigned to the undersigned. (Order of Recusal, ECF No. 70.)

presence of a trialworthy issue." <u>Trading Triangle Co. v. Robroy</u> <u>Indus., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (alteration and quotation marks omitted). In other words, "the nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." <u>Cordi-Allen v. Conlon</u>, 494 F.3d 245, 250 (1st Cir. 2007) (alteration and quotation marks omitted). But "if the proffer . . . is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Acosta v. Ames Dep't Stores, Inc.</u>, 386 F.3d 5, 8 (1st Cir. 2004) (quotation marks omitted).

B.   Disparate Impact

Title VII forbids employers from engaging in "'employment practices that cause [] a disparate impact on the basis of race' unless those practices are justified by business necessity." <u>Jones</u> <u>v. City of Boston</u>, 752 F.3d 38, 46 (1st Cir. 2014) (quoting 42 U.S.C. § 2000e-2(k)). The purpose of a disparate impact claim is to target unnecessary employment practices – such as those utilized to make hiring and promotional decisions – that are neutral in theory but discriminatory in practice. <u>See</u> <u>Prescott v. Higgins</u>, 538 F.3d 32, 41 (1st Cir. 2008); <u>E.E.O.C. v. S.S. Clerks Union,</u> <u>Local 1066 (Steamship Clerks)</u>, 48 F.3d 594, 601 (1st Cir. 1995) ("Discrimination may . . . result from otherwise neutral policies and practices that, when actuated in real-life settings, operate to the distinct disadvantage of certain classes of individuals.").

A plaintiff bears the burden of getting her disparate impact claim off the ground. She does so by making out a prima facie case, which consists of "showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" Abril-Rivera v. Johnson, 806 F.3d 599, 606 (1st Cir. 2015) (quoting Ricci v. DeStefano, 557 U.S. 557, 578 (2009)). The gravamen of a plaintiff's prima facie case is very often statistical analysis evincing a significant disparity between the outcomes – resulting from a particular employment practice – for protected and unprotected classes. Indeed, as the First Circuit noted in Jones, "The Supreme Court has most recently described a prima facie showing of disparate impact as 'essentially[,] a threshold showing of a significant statistical disparity . . . and nothing more.'" 752 F.3d at 46 (quoting Ricci, 557 U.S. at 587); accord Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2523 (2015) ("A plaintiff who fails to . . . produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."); Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 994 (1988) (finding that, in order to prove a prima-facie case, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or

promotions because of their membership in a protected group."
(emphasis added)).

The human brain is not wired for reliable statistical
intuition. Daniel Kahneman, Thinking Fast & Slow 5, 13 (1st
paperback ed. 2013) ("We easily think associatively, we think
metaphorically, we think causally," but "[e]ven statisticians are
not good intuitive statisticians."). Statistical analysis is
therefore required to help courts avoid making incorrect
statistical inferences from raw data. See Fudge v. City of
Providence Fire Dep't, 766 F.2d 650, 658 (1st Cir. 1985) (requiring
statistical tests in disparate impact cases to prevent "wholly
intuitive response" to data); Meditz v. City of Newark, 658 F.3d
364, 374 & n.17 (3d Cir. 2011) (noting that proper statistical
analysis necessitated "calculation of the standard deviation[,]
. . . rather than a subjective view of . . . relative percentages").
Statistics are particularly important in disparate impact cases to
rule out – or at least substantially diminish – the possibility
that an observable difference between protected and unprotected
classes flowing from an employment practice are due simply to
chance. See Fudge, 766 F.2d at 657 ("Where the use of employment
tests results in differential pass rates for blacks and whites,
even an apparently substantial differential, the discrepancy may
be due to chance."). Indeed, the First Circuit in Fudge overturned
a disparate impact finding because even though a disparity existed

14

in the data, statistical analysis clearly revealed that "the role of chance as an explanation [for the observed discrepancy] [was] far too high." Id. at 658-59.

There are cases, to be sure, where courts have excused a plaintiff's failure to provide statistical analysis. But these are few, far between, and only where the raw numbers evince the most egregious disparities. See, e.g., Steamship Clerks, 48 F.3d at 606; Stout v. Baxter Healthcare Corp., 282 F.3d 856, 861 (5th Cir. 2002) ("In certain situations a Title VII plaintiff is relieved of a burden they would ordinarily bear: the production of statistical evidence comparing the effects of a challenged policy on protected and unprotected groups of employees."). In Steamship Clerks, the First Circuit upheld a finding that the Equal Employment Opportunity Commission had made out a prima facie case of disparate impact discrimination despite the Commission's failure to perform a statistical analysis of the data. 48 F.3d at 606. This was a case, however, where the challenged employment practice had resulted in no minority union hires in six years. Id. at 605. Given this "unique factual mosaic," the unanalyzed data – or as the court put it, "the unvarnished reality of the situation" – contained such "logical force" as to make the district court's conclusion that plaintiff had carried its initial burden "irresistible." Id.; see also Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 153-54 (2d Cir. 2012) (showing of statistical significance unnecessary

where "<u>no</u> Asian Americans were promoted during the relevant period").

The factual mosaic presented in this case is not compelling enough to make up for Luceus's lack of statistical analysis. Unlike in <u>Steamship Clerks</u>, where plaintiff provided data showing six years of zero successful minority applicants, the data here show that there were minorities in management at the Call Center and on the Consortium Project. (Defs.' Mot., Ex. J, 1; Defs.' Mot., Ex. K, 1.) There are, of course, differences in the number of white and minority employees in DLT management, but Luceus has made no effort to show that these differences are statistically significant – that is, that they are unlikely to be the result of chance, but rather suggestive of discrimination. She has not, for example, provided basic statistical computations such as standard deviation.[4] <u>See</u> <u>Jones</u>, 752 F.3d at 43-44 ("In disparate impact cases, standard deviation serves as another way of measuring the amount by which the observed disparity in outcomes differs from the average expected result given equal opportunity . . . ."). Nor has she offered any expert testimony to interpret the data. <u>See</u> <u>Frazier v. Consol. Rail Corp.</u>, 851 F.2d 1447, 1452-53 (D.C. Cir. 1988) ("Statistical calculations performed on data in

---

[4] 1.96 standard deviations is the threshold for statistical significance "commonly used by social scientists [and m]ost federal courts." <u>Jones</u>, 752 F.3d at 46-47 & n.9 (collecting cases).

discrimination cases are not probative of anything without support from an underlying statistical theory" that makes them "meaningful to the finder of fact" thereby "permit[ting] the plaintiffs to carry their burden of showing that their statistics are significant.").

Another fundamental problem with Luceus's statistical evidence is that it does not indicate how many minority union employees were eligible for promotions, instead assuming that all were eligible. Cf. Chin, 685 F.3d at 152 ("In the typical disparate impact case the proper population for analysis is the applicant pool or the eligible labor pool."); Frazier, 851 F.2d at 1454 (affirming dismissal of disparate impact claim where plaintiff's statistical evidence provided "no basis . . . for comparison between the number of blacks who were eligible for promotion at any given time with the number of blacks actually promoted at that time"). But the undisputed evidence is that management positions required a skill set unlikely to be found at the lower reaches of the union totem pole; indeed, Luceus's argument is that her credentials set her apart from her colleagues and made her especially suited for promotion. See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 n.13 (1977) ("When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who

possess the necessary qualifications) may have little probative value.").

Thus, without the number of management-ready minority and white union members, the Court is left without the data necessary to make a determination as to the overall effect of the Call Center's employment practices – much less a determination that any such effect was statistically significant. See Bennett v. Nucor Corp., 656 F.3d 802, 817-18 (8th Cir. 2011) ("[P]laintiffs' statistical evidence was inadequate to create a genuine issue of material fact . . . [where] plaintiffs failed to show that their statistical 'applicant pools' contained only individuals who were at least minimally qualified for the promotions in question . . . ."); Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 912 (4th Cir. 1989) (finding evidence of minority employment in supervisory and clerical positions insufficient where that evidence "d[id] not disclose how many employees in the pool were qualified to become supervisors").

The foregoing defects of Luceus's evidence compels the Court to grant Defendants summary judgment on her disparate impact claim.

C.    Disparate Treatment

In addition to prohibiting unjustified employment practices that disparately impact a protected class, Title VII also "forbids . . . 'overt discrimination' in the form of disparate treatment." Steamship Clerks, 48 F.3d at 600 (quoting Griggs v. Duke Power

Co., 401 U.S. 424, 431 (1971)). Where, as here, the plaintiff has not offered direct proof of defendants' discriminatory animus, courts rely on the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

Under this framework, plaintiffs bear the initial burden to establish a prima face case of discrimination.[5] Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995). Once the plaintiff establishes her prima facie case, the burden shifts to the defendant to produce evidence that shows "a legitimate, nondiscriminatory justification for the adverse employment action." Ray, 799 F.3d at 113. If the defendant produces such evidence, the burden of production returns to the plaintiff, who must show that the defendant's stated justification for the adverse employment action was mere pretext. Udo, 54 F.3d at 12-13. Plaintiff's evidence on this score "must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus." Id. at 13.

The Court need not conduct a seriatim analysis of Luceus's disparate treatment claim: even assuming she has made out a prima facie case, the Defendants have produced evidence that the

---

[5] In racial-discrimination cases where the alleged adverse-employment action consisted of a failure to promote, the plaintiff's prima facie case involves showing that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the job; (3) the employer took an adverse employment action against h[er]; and (4) the position remained open or was filled by a person with similar qualifications." Ray v. Ropes & Gray LLP, 799 F.3d 99 (1st Cir. 2015) (quotation marks omitted).

Department's failure to promote Luceus was based on nondiscriminatory reasons, and Luceus has failed to counter with any evidence that these reasons were mere pretext. See Cham v. Station Operators, Inc., 685 F.3d 87, 95-96 (1st Cir. 2012) ("We may bypass the prima facie case issue because it is clear that plaintiff has not mustered enough evidence for a reasonable jury to conclude that the defendant's stated reason for the employment action was pretextual." (alteration and quotation marks omitted)).

There is evidence in the record to support the Department's contention that the reason it did not promote Luceus was because of her disruptive workplace behavior. For example, Rose Lemoine (a former manager at DLT) testified that, within two years of Luceus's tenure at the Department, she engaged in an altercation with a co-worker that required the two be physically separated. (DSUF 21-22.) According to the Department, Luceus also has a history of returning late from work breaks, refusing to collaborate with her coworkers, and posting signs in her cubicle to provoke management. (Id. at 21-39.)

In response, Luceus has not introduced sufficient evidence that would allow a reasonable factfinder to find that the Department's "articulated reason [for not promoting her] was a pretext for discrimination." Udo, 54 F.3d at 13; see also Ray, 799 F.3d at 113 ("[Employee] must elucidate specific facts which would enable a jury to find that the reason given is not only a sham,

but a sham intended to cover up the employer's real and unlawful motive of discrimination." (quotation marks omitted)). Rather, Luceus relies on evidence that she was qualified to be a manager and yet was skipped over when it came to promotions, the same evidence that would meet her prima facie burden. (Pl.'s Obj. 58-59.) She also reasserts the statistical evidence she used to bolster her disparate impact claim. (Id.)

This is simply not enough to raise a triable issue of fact as to pretext. For starters, Luceus has not provided evidence that those promoted over her were "similarly situated to her in all relevant respects." Ray, 799 F.3d at 114 ("[W]hile [a] plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." (quotation marks omitted)). She maintains that DiChiro-Bogan, Alvarado, and Bliss-Wohlers, among others, were similarly situated in that, prior to their promotions, they, like Luceus, lacked management experience. (Pl's. Obj. 17-18, 20.) However, Luceus has not pointed to someone promoted in her stead that had, for example, a comparable history of workplace recalcitrance. See Ray, 799 F.3d at 114-15 (finding plaintiff's comparison cases furnished "too little similarity . . . to furnish a basis for suspecting racial discrimination," where negative comments about plaintiff's workplace behavior "were distinctively

more extreme, and more numerous, than those contained in the evaluations of any of the comparators he offered.").

Her numbers, furthermore, do even less here than they did in the disparate impact context. As the First Circuit observed in Ray, "[S]tatistical evidence of a company's general hiring patterns, although relevant, carries less probative weight, and in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision." 799 F.3d at 116 (quotation marks omitted); see also Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531, 552 (9th Cir. 1982) ("It must always be remembered that regardless of how devastating or reliable the statistics may look, the issue remains in disparate treatment cases whether a particular isolated historical event was discriminatory." (alterations and quotation marks omitted)).

In short, the Court finds that, even when the facts are viewed in her favor, Luceus has introduced at most de minimis evidence showing pretext, which is "insufficient for a rational factfinder to infer that [the Department]'s actions were based not on [Luceus's] perceived failings, but on discriminatory animus." Ray, 799 F.3d at 117 (quotation marks omitted). Accordingly, the Court will grant the Defendants' summary judgment motion as to this claim. And because Luceus has not adduced sufficient evidence of intentional discrimination, her claims under 42 U.S.C. § 1981

necessarily fail, too. <u>See</u> <u>Alexis v. McDonald's Rests. of Mass.,</u> <u>Inc.</u>, 67 F.3d 341, 346-47 (1st Cir. 1995).

    D.   Retaliation

    Luceus's remaining claim is one for retaliation under the Civil Rights Act of 1866. Her contention is that the Department punished her for complaining about its allegedly discriminatory practices to the Rhode Island Commission for Human Rights. (Pl.'s Obj. 59-62.) Among the alleged retaliatory acts were those by members of Department management "disrespecting, marginalizing[,] and ostracizing Plaintiff". (SAC 15.) For example, Luceus alleges that management ordered that Luceus's movements at work, including to and from the bathroom, be monitored by another employee. (<u>Id.</u> at 13.)

    Her retaliation claim is a nonstarter, whatever truth there is to these allegations: the Civil Rights Act of 1866 codified an old version of 42 U.S.C. § 1981 that the Supreme Court ruled "d[id] not apply to conduct which occurs after the formation of a contract." <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 171 (1989), <u>superseded by statute</u>, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, <u>as recognized in</u> <u>CBOCS W., Inc. v.</u> <u>Humphries</u>, 553 U.S. 442, 449-51 (2008). Therefore, even if the old version of § 1981 were still operative, it would not provide a basis for Luceus's retaliation claim.

Moreover, the current version of § 1981 – a result of the Civil Rights Act of 1991 – similarly lacks a toehold for Luceus. See Buntin v. City of Boston, 857 F.3d 69, 70, 71 (1st Cir. 2017). The First Circuit recently held that even though the 1991 Act overruled Patterson, it did not do the same to Jett v. Dall. Indep. Sch. Dist., where the Court held "that § 1981 does not provide an implied private right of action for damages against [state government] officials and that 'the express cause of action for damages created by [42 U.S.C.] § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'" Buntin, 857 F.3d at 70, 71 (quoting 491 U.S. 701, 733 (1989)).

This dooms Luceus's retaliation claim. At an earlier stage of this litigation, the Court struck from her SAC "any claim for relief brought under Section 1983." See Luceus, 2016 WL 7971311, at *3, adopted by 2017 WL 318646, at *1. And without § 1983, any right Luceus may have under § 1981 is without a remedy. See Chelentis v. Luckenbach S.S. Co., 247 U.S. 372, 384 (1918) ("The distinction between rights and remedies is fundamental. A right is a well founded or acknowledged claim; a remedy is the means employed to enforce a right or redress an injury."). Therefore, like soup served with a fork, Luceus's retaliation claim is unable to reach its intended destination. See Buntin, 857 F.3d 69, 75 (holding that "§ 1983 remains 'the exclusive federal damages

remedy' for § 1981 violations by state actors," and affirming summary judgment against employee on her § 1981 retaliation claim (quoting <u>Jett</u>, U.S. at 735)).

III. Conclusion

The Court is, of course, troubled by the sworn testimony in this case describing the Department's hiring practices as shot through with nepotism and racism. Insofar as these averments are credible, DLT management would be well-served to investigate. But whatever their merit, the Court cannot overlook the fatal deficiencies of Luceus's evidence, and therefore must GRANT Defendants' Motion for Summary Judgment (ECF No. 50).

IT IS SO ORDERED.

William E. Smith
Chief Judge
Date: March 30, 2018